IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


CROW V. CHELLI


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


BOB L. CROW, APPELLEE,

V.

MARLENE E. CHELLI, APPELLANT.


Filed October 10, 2017.    No. A-16-869.


Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed.

Marlene E. Chelli, pro se, and, on brief, James Walter Crampton for appellant.

Christopher A. Vacanti and William L. Finocchiaro, of Vacanti Shattuck, for appellee.


MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Marlene E. Chelli appeals from the order of the district court for Douglas County modifying a paternity decree and awarding Marlene and Bob L. Crow joint physical custody of the parties' minor children. The court also modified the original award of joint legal custody to give Bob final decisionmaking authority for matters concerning the children's education. For the reasons set forth herein, we affirm.

### BACKGROUND

Marlene and Bob are the parents of Ethan Chelli, born in 2009, and Elizabeth Chelli, born in 2010. On July 7, 2015, the district court entered a paternity decree finding both parties fit and proper persons to have legal care, custody, and control of the children and awarding physical custody to Marlene subject to Bob's every other weekend, holiday, and vacation parenting time as

- 1 -

set forth in the parties' parenting plan. The court ordered Bob to pay child support of $801 per month for two children and $546 when one minor child remained. The parenting plan approved by the court provided, among other things, for the children's "access to telephone and email contact with the other parent." The parenting plan also specified that face-to-face communication between the parties was not a reasonable method for appropriate issue resolution and detailed how issues should be resolved between the parties via email. Although the plan provided for joint legal custody, it specified that Marlene, as the possessory parent, "shall make the final decision for the children concerning health, education, and religious matters."

On March 30, 2016, Bob filed a complaint for modification in the district court. Bob alleged that a material change in circumstances had occurred since entry of the decree in that Marlene had failed to assure that the children attended school in a reasonable manner and that they received a proper education; to provide for the reasonable needs of the children; to assure that the children had an ongoing relationship with Bob; and had frustrated and denied Bob his court-ordered parenting time with the children. Bob also alleged that a material change in circumstances had occurred because Marlene was either unable or unwilling to provide for the children in a manner consistent with their best interests. Finally, Bob alleged that he was willing and able to provide for all of the children's needs in a manner consistent with their best interests. He asked the court to modify legal and physical custody and parenting time based on the children's best interests and to order child support accordingly.

On March 30, 2016, Bob also filed a motion and affidavit pursuant to Neb. Rev. Stat. § 42-364.15 (Reissue 2016) alleging that Marlene had interfered with his parenting time under the decree. Specifically, Bob alleged that Marlene regularly denied him telephone contact with the children, had minimized or not allowed all of his summer and holiday parenting time, and regularly denied him parenting time or required parenting time to be exercised in her home. Bob also alleged that Marlene had "in the past threatened to have an Amber Alert issued unless she gets her way in relation to parenting time." Bob asked the district court to find Marlene in contempt of the decree and to award him temporary possession of the children.

On April 25, 2016, the district court entered an order granting Bob's motion. The court ordered that Bob's parenting time resume immediately consistent with the terms of the decree and parenting plan, specified the dates of Bob's next weekend of parenting time, and ordered when Bob's summer parenting time for 2016 was to occur. The court also directed the parties to comply with all provisions of the parenting plan, specifically including the provision for telephone communication with the children.

Marlene filed a pro se answer and counterclaim on May 13, 2016 requesting that the district court modify the decree to award her full legal and physical custody with reduced parenting time for Bob.

On May 20, 2016, Marlene filed a pro se motion and affidavit for temporary relief and ex parte custody, in which she alleged that the children had returned from Bob's parenting time with bad sunburns that required medical treatment. She also alleged that Ethan had a bruise, which Ethan told her occurred after he was slapped by either Bob or Bob's sister, and that she was afraid for her safety due to past threats of violence by Bob. The court entered an ex parte order granting

Marlene's motion for temporary custody, suspended Bob's parenting time until further order, and scheduled a hearing.

An attorney filed an appearance of counsel on Marlene's behalf on June 8, 2016, but that attorney filed a motion to withdraw, which was granted by the court on July 13. A second attorney filed an appearance of counsel on Marlene's behalf on July 8. Marlene file a pro se motion on July 20, seeking to represent herself and asking the court to remove the second attorney. The second attorney then filed a motion to withdraw, which was granted by the court on August 2.

A modification hearing was held before the district court on August 3, 2016. Bob appeared with his attorney, and Marlene appeared pro se. She did not ask for a continuance or express an unwillingness to proceed pro se at any point during the hearing. During the course of her testimony, Marlene referenced the fact that English is not her first language, but she did not request an interpreter or indicate at any point during the hearing that she needed one. The court heard testimony from Bob, Marlene, and an Omaha Public Schools employee and received various exhibits, including printouts of text messages exchanged by the parties, school records, medical reports, and documentation from law enforcement and Child Protective Services (CPS) investigations.

Bob is a chiropractor, and at the time of the decree, he was living in Lincoln, working at a chiropractic office. In approximately October 2015, he moved to Arnold, Nebraska for a lower cost of living and to be close to his extended family. While in Arnold, he worked on his parents' farm. At the beginning of July 2016, he moved to Omaha, where he found work as a chiropractor. Bob testified that he intended to remain living there.

Bob testified to his belief that there had been a material change in circumstances since entry of the paternity decree, in that he had had difficulty obtaining the parenting time and telephone contact with the children awarded to him in the decree. The record reflects that Marlene has not consistently allowed Bob to have contact with the children. The parties have difficulty communicating with each other, and at some point Bob resorted to spending time with Marlene in order to have access to the children. Eventually, Bob stopped spending time with Marlene, but she was still reluctant to allow him contact with the children outside of her presence. For example, Bob returned the children to Marlene prior to the end of his parenting time during Christmas break 2015, because Marlene threatened to have an AMBER Alert issued if he did not return them early. Other communication difficulties noted by Bob included Marlene's failure to discuss the children's medical needs with him before taking them to the doctor and the "numerical code" Marlene developed to use when speaking with the children by telephone when they are in Bob's care. Bob noted that Elizabeth became upset and cried after one such telephone conversation because she had forgotten the code. Bob has asked Marlene to "just have a normal conversation with the children" without using "these random numbers."

Additional issues raised by Bob as reflecting a material change in circumstances were Marlene's allegations that he sexually assaulted her and abused the children. Concerning the alleged sexual assault, Marlene filed a petition and affidavit to obtain a domestic abuse protection order against Bob in April 2016, setting forth allegations that Bob raped her and interfered with her parenting time. Marlene's petition was dismissed following a show cause hearing in May. At the modification hearing, Bob denied having ever sexually assaulted Marlene. He also offered

copies of text messages showing that the parties were having cordial communications at the time of the alleged sexual assault.

With respect to the alleged abuse of the children, after Bob returned the children following his weekend of parenting time in early May 2016, they had sunburns and Ethan had a small bruise on his hip. According to Marlene, Ethan said Bob struck him. Marlene filed a motion for ex parte temporary custody, which kept Bob from receiving his next weekend of scheduled parenting time. Marlene went to four different medical clinics before she obtained information to support her claims of abuse, and her claims led to investigations by both CPS and law enforcement. CPS documentation admitted into evidence suggests Marlene was coaching the children. CPS determined the allegations were unfounded, and law enforcement determined that the bruise on Ethan's hip was consistent with "a child falling onto the ground or into something, a typical injury on a young active 6 year old." Marlene has made other reports to CPS resulting in five previous intakes, which were either not taken for investigation or were determined to be unfounded. Bob testified at the modification hearing that he would never abuse or assault his children.

Another issue addressed at the modification hearing was the children's school attendance and registration. In 2014/2015, the children attended an elementary school in Omaha (the first school). Marlene placed them in an elementary school in Millard at the beginning of the 2015/2016 school year (the second school), which they attended for one quarter of the school year. During that time, Elizabeth was absent for six days and tardy once, while Ethan was absent for five days and tardy once. After the first quarter, Marlene moved the children to a bilingual school in Omaha (the third school), which they attended for the second quarter of the school year. During the second quarter, Ethan missed almost five days, while Elizabeth missed slightly more than four days. Their last day of attendance at the third school was January 25. As of February 1, 2016, Elizabeth had missed 11.1 days of school for the year; Ethan had missed 13.74 days. Marlene home schooled the children for the remainder of the 2015/2016 school year.

Marlene registered the children to attend a private Catholic school in Elkhorn for the 2016/2017 school year, and Bob expressed concern about the ability to pay for this school. Marlene presented evidence that she had obtained scholarships that would pay for at least some of the children's tuition at this school for the year. In response to the court's question about "the plan for the children if there is no extra money" beyond the scholarship, Marlene testified that her grandfather would pay the balance of the tuition costs. The court inquired as to whether Bob would agree to the children attending this school if the tuition was covered. Bob responded that he would want to look into it more and expressed concern that "if the funding . . . dries up," Marlene might return to home schooling the children.

Ethan has some behavioral issues, including issues with focus and self-control, and Marlene had some concerns about Ethan's treatment at the second school. Testimony on these issues as well as the children's school attendance was provided by Robert Johnson, a school support liaison for Omaha Public Schools. On February 8, 2016, the school sent out a letter noting that that the children had missed "**the time equivalent of 15 or more days of school**" and requesting additional documentation about the children's absences. Johnson did not find the documentation provided by Marlene in response to this request credible. Johnson requested further documentation from Marlene, but she did not provide any. The school did not end up reporting the

situation to the county attorney's office, because Marlene moved Ethan to home school status as of February 8. Elizabeth was not listed on home school status at that time, but Johnson did not follow up further with respect to Elizabeth because she was under the age of required school enrollment.

Johnson testified about his observations of and interactions with both Bob and Marlene while the children were enrolled at the third school. Johnson found Bob to be "a caring, concerned parent for his children, yet, very subdued and very guarded." Marlene initially appeared to be a "very concerned parent and wanting the best for her children," but according to Johnson, over time, her behavior "became more erratic and concerning." Johnson testified that Marlene began to visit the children more than what he had observed other parents to do and injecting herself into the school environment to the point where it became disruptive to the children and their education. Johnson agreed, however, that Marlene never interfered in the classroom while class was in session.

With respect to Ethan's behavioral issues, Johnson testified that it became apparent that Ethan needed one-on-one attention. After the first week, school personnel "began to suspect that Ethan may be on the autism spectrum somewhere, with some of the behaviors that he was exhibiting in the classroom." Johnson agreed that Ethan might also have "ADHD" in combination with a diagnosis of autism. According to Johnson, when the school notified Marlene of its concerns, she "was in complete denial that there was anything wrong with Ethan." In one conversation with Marlene about Ethan, Johnson suggested she explore the special education testing process, after which she would have the choice to accept or deny those services. In response, Marlene expressed concern about Ethan being labeled as a "special education child" and stated she would think about it. Johnson was unaware of Ethan being abused by any staff or personnel at the third school. The school tried to arrange a "Student Assistant Team meeting" to discuss strengths and deficits observed in the classroom and to discuss strategies and ideas to help Ethan succeed, but Marlene wanted to take Ethan to a doctor before proceeding. The school did have the meeting, which Marlene attended, and various strategies were discussed and implemented.

Marlene provided testimony on her behalf in response to questions from the district court. Marlene expressed concern that Bob's move to Omaha would be only temporary. She testified that her living situation was stable as she had been living in the same place since 2013 and because she had financial assistance from her parents. Marlene testified that she tried to "give [the children] the best" in home schooling them, despite English not being her first language. She felt that attending the private Catholic school would be in the children's best interests because of the quality of the school and the ratio of teachers per student. Marlene felt that it would be best for her to have legal and physical custody, with Bob having parenting time "every other weekend and less time during the summer," to "create a more consistent environment." She expressed concern about litigation initiated by Bob, conflict with Bob, and the involvement of police and CPS. Marlene stated that she had "ten or fifteen investigations against me," but observed that nothing had been found wrong with her home environment as a result of those investigations and that the children's needs were all covered. In concluding her direct testimony, Marlene expressed love for her children and concern over her treatment by Bob's family.

On cross-examination, Marlene again asserted that Bob had raped her, and she stated that Bob has threatened to kill her in the past. With respect to employment, Marleen testified that she had a job offer for work in a child care center where she expected to work part-time "or as they need me," earning $10 an hour. She has had similar previous employment at similar rates of pay. Marlene testified that she also receives financial assistance from her parents, grandparents, and friends from church. Marlene attends two churches, a "Spanish church" and a nondenominational Christian church. Although the children are not Catholic, she felt that "a good education is a Christian education" and testified that this would be provided by the school she had enrolled them in for the 2016/2017 school year. According to Marlene, Ethan was tested for autism in 2014 prior to attending the first school, and the doctor who tested him felt that Ethan "doesn't have the spectrum syndrome" but that he had "[A]DHD" characteristics. Marlene was also asked about the numeric code she uses on the telephone with the children. Marlene explained that "666" means "my daddy is not hitting me" and "555" means "we're doing fine." When asked if she thought having these codes was appropriate, she testified, "I think that I can have free communication with my kids without an interruption or . . . without being supervised by someone."

The district court entered an order of modification on August 11, 2016. The court found that Bob had shown a material change in circumstances "warranting modification," but it did not specifically state what material change or changes in circumstances necessitated the modifications ordered. The court modified legal custody by awarding Bob final decisionmaking authority for matters concerning the children's education. It modified physical custody by awarding joint physical custody with a rotating week-on/week-off parenting time schedule. The court also specified changes in summer parenting time, the division of the children's winter/Christmas break between the parties, child support, and other matters not relevant to the present appeal.

Marlene subsequently filed pro se motions, seeking, among other things, a new trial and/or to alter or amend the modification order. At the new trial hearing, Marlene was represented by counsel. Marlene offered an affidavit in which she stated that she discharged the second attorney to represent her in the modification proceedings because they did not agree on how to present the case, that this attorney's failure to promptly withdraw as her counsel of record hindered her ability to obtain new counsel prior to the modification trial, and that she did not obtain her file from this attorney until after the modification trial. Marlene also asserted that she never received her file from the first attorney who represented her in the modification proceedings. Marlene also stated that she is from Paraguay and her primary language is Spanish. According to Marlene, while she uses English in her everyday life, she has difficulty when verbal exchanges are fast or when uncommon words are being used, or "when questions are posed in a reverse order." Marlene stated that she requested an interpreter prior to the modification hearing by "calling the interpreter's office in the Civic Center" but that an interpreter was not provided at the hearing. She alleged that she appeared at the August 3, 2016 hearing without an attorney or an interpreter and requested a continuance but that her request was denied. Marlene stated that many documents were presented during the modification hearing, that her inability to read English quickly "caused [her] to be unaware of the contents of the documents," and that she was unable to respond to the documents because she did not know what they said.

After hearing argument from the parties' attorneys, the district court found that, even considering Marlene's affidavit, Marlene chose to and did represent herself at the modification hearing. The court stated that, having presided over that hearing, it felt, at the time, that Marlene was "thoroughly prepared and was able to sufficiently present her case, cross-examine witnesses . . . and conduct her case on her behalf." The court did not recall ever being presented with "the issue of the interpreter." The court denied Marlene's motions and entered an order memorializing that decision on September 1, 2016.

The parties filed several ex parte motions following entry of the modification order. On August 16, 2016, Bob filed a verified motion and affidavit for ex parte order, asking the court for an ex parte order awarding him immediate possession of the parties' minor children, utilizing the assistance of law enforcement if necessary, and compelling Marlene to provide any necessary documentation or assistance to enroll the minor children for the upcoming academic year in accordance with the modification order. Bob alleged that under the modification order, his first week of parenting time should have commenced on August 7, that he was not allowed any parenting time during that week as Marlene refused to exchange the children, and that he had not been given telephone access to the children. Bob also alleged that Marlene had refused to comply with his requests to provide information necessary to enroll the children in school, which started on August 17. Bob asked that his parenting time be altered so that his first regular week would begin on August 14. The court entered an ex parte order on August 16, granting Bob's request for immediate possession of the minor children, with his first week of regular parenting time to begin on August 14, and ordering Marlene to provide necessary documentation or assistance to enroll the children in school. The court scheduled a hearing for September 22.

On August 22, 2016, Marlene, pro se, filed a motion for ex parte custody and sole education rights. She alleged that Bob had failed to enroll the children prior to the start of school on August 17, that the children were still out of school as of August 22, and that Bob has not "enroll[ed] or desired to enroll the kids to attend any of the schools that are available to [them] to this day." Marlene asked for temporary sole custody of the children "to be able to enroll and make the kids attend school [sic] that are available to them as soon as possible." The court heard Marlene's motion on August 22. Marlene appeared pro se. Bob's attorney, whom the court contacted prior to the hearing "so that each party could be heard," appeared by telephone. On August 23, the court entered an order dismissing Marlene's motion without prejudice. The court found that there was not an emergency situation and advised Marlene that if the children had not been enrolled by August 29, she could file another motion for custody and sole education rights.

On August 29, 2016, Marlene filed another pro se motion for ex parte custody and sole education rights. The disposition of this motion is not reflected in the record on appeal.

## ASSIGNMENTS OF ERROR

Marlene asserts, reordered and restated, that the district court abused its discretion in (1) modifying physical custody, (2) granting joint physical custody without making written findings required by Neb. Rev. Stat. § 43-2932 (Reissue 2016), and (3) granting Bob final decisionmaking authority as to education.

Marlene was represented by counsel at the time of her initial appellant brief, but her attorney subsequently withdrew. Marlene then filed a pro se reply brief, in which she raises many additional arguments not assigned as error in her initial brief. A pro se litigant will receive the same consideration as if he or she had been represented by an attorney, and, concurrently, that litigant is held to the same standards as one who is represented by counsel. *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015). Errors argued but not assigned will not be considered on appeal. *Hike v. State*, 297 Neb. 212, 899 N.W.2d 614 (2017). The purpose of an appellant's reply brief is to respond to the arguments the appellee has advanced against the errors assigned in the appellant's initial brief. *Id*. Errors not assigned in an appellant's initial brief are waived and may not be asserted for the first time in a reply brief. *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014). Accordingly, we have not addressed those arguments Marlene raises for the first time in her reply brief that were not assigned as error in her initial brief.

## STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## ANALYSIS

*Modification of Physical Custody*.

Marlene asserts that the district court abused its discretion in modifying the decree and ordering joint physical custody.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016). In a child custody modification case, first, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id.* Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*. A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. *State on behalf of Jakai C., supra*. The party seeking modification of child custody bears the burden of showing as an initial matter that there has been a change in circumstances. *Id*.

The paramount consideration in determining child custody is the best interests of the children. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). A child's best interests requires a parenting arrangement and parenting plan which provides for "a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). Section 43-2923(6) provides:

(6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . . and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

In this case, the district court found a material change in circumstances since entry of the paternity decree. The court modified physical custody and found that an award of joint physical custody was in the children's best interests.

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Reissue 2016). A trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016). As stated in Neb. Rev. Stat. § 42-364(3) (Reissue 2016):

Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint

physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

Joint physical custody should be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars. *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017).

In this case, the district court did not specifically state what material change in circumstances necessitated modification of physical custody, but upon our de novo review, we conclude that there was a material change in circumstances affecting the children's best interests, namely, that since entry of the decree, Marlene has regularly frustrated Bob's ability to exercise his parenting time, through means disruptive to the lives of the children and the parties, and has further disrupted the children's lives by interference with the children's education. The parties have a contentious relationship and clearly need a physical custody and parenting time arrangement that will minimize opportunities for conflict and one that will also produce stability and consistency for the children. While the week on/week off parenting time arrangement does not necessarily reduce the total number of custody exchanges that occur during the year, it does spread them out on a regular, consistent basis, and allows for equal parenting time with both parents, something which the court addressed in its findings from the bench.

At the modification hearing, after finding that the evidence showed "a material change in circumstance that would warrant a modification of the order for paternity," the court found that it was in the children's best interests that Bob and Marlene have joint legal and joint physical custody and that education decisions should be made by Bob. The court stated, "To effectuate the joint physical, the Court is clarifying by saying that it is also in the best interests that the minor children have access to their mother and father and parenting time with their mother and their father, and that the parenting time will be a percent to each parent." The court then inquired about a week on/week off parenting schedule, which Bob's counsel agreed made sense based on the evidence. Marlene objected that joint custody and the proposed parenting time schedule was not in the children's best interests, stating that "[t]his man was terrible." We acknowledge Marlene's concerns, but given the conflicting evidence we consider and give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). Upon our de novo review, we find no abuse of discretion.

*Written Findings Under § 43-2932.*

Marlene asserts that the district court abused its discretion in granting joint physical custody without making written findings required by § 43-2932. She argues the court's finding that granting joint physical custody to Bob was appropriate does not satisfy the statute's requirement of explicit findings. She relies on evidence about Bob's alleged physical abuse of the children and alleged sexual assault of her.

According to Neb. Rev. Stat. § 43-2929 (Reissue 2016):

(1) When the court is required to develop a parenting plan:

(a) If a preponderance of the evidence demonstrates, the court shall determine whether a parent who would otherwise be allocated custody, parenting time, visitation, or other access to the child under a parenting plan:

(i) Has committed child abuse or neglect;

(ii) Has committed child abandonment . . . ;

(iii) Has committed domestic intimate partner abuse; or

(iv) Has interfered persistently with the other parent's access to the child . . . ; and

(b) If a parent is found to have engaged in any activity specified by subdivision (1)(a) of this section, limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm. . . .

. . . .

(3) If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

Section 43-2923(2) states that when a preponderance of the evidence indicates domestic intimate partner abuse, the best interests of the child require a parenting and visitation arrangement that provides for the safety of the "victim parent." A preponderance of the evidence is the equivalent of the greater weight of the evidence. See *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true. NJI2d Civ. 2.12A.

In the present case, Marlene made numerous allegations of abuse by Bob against herself and the children, including allegations that Bob sexually assaulted her, but there was no finding by the court that such abuse occurred. Marlene's allegations that Bob had physically abused the children were investigated by CPS and law enforcement, both of which determined the claims to be unfounded. Marlene's application for a protection order based on the allegations of physical abuse and sexual assault was dismissed, and there was conflicting evidence presented at the modification hearing with respect to these issues. Again, we consider and give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *State on behalf of Jakai C., supra*. Because Marlene has not shown by a preponderance of the evidence that Bob engaged in one of the acts specified in § 43-2932(1), the court was not required to make written findings pursuant to § 43-2932(3) before awarding Bob joint physical custody. This assignment of error is without merit.

*Modification of Education Decisionmaking Authority.*

Marlene asserts that the district court abused its discretion in granting Bob final decisionmaking authority as to education. The court found that a material change in circumstances had occurred since the decree, and it modified the previous award of joint legal custody by granting Bob final decisionmaking authority for matters concerning the children's education.

The district court found a material change in circumstances but did not specifically state what material change necessitated the modification of final decisionmaking authority. Clearly, the court believed, and we agree, that there was a material change affecting the children's best interest, in that since the decree, Marlene changed the children's school three times, and proposed yet another change in school for the following school year. The children had missed numerous days of school while under Marlene's physical custody. Marlene also injected herself into the school environment to the point where it became disruptive to the children and their education. The court did not abuse its discretion in granting Bob final decisionmaking authority with respect to the children's education.

## CONCLUSION

The district court did not abuse its discretion in modifying physical custody, granting joint physical custody without making written findings required by § 43-2932, and granting Bob final decisionmaking authority as to education.

AFFIRMED.